Case number 173904 and 173917 Exel Inc v. Southern Refrigerated Transport Inc. Argument is not to exceed 15 minutes per side. Mr. Lipschatz, you may proceed for the appellant. Thank you. Good morning, Your Honor, and may it please the Court. My name is Joshua Lipschatz, and I represent the carrier in this dispute, Southern Refrigerated Transport. I intend to reserve three minutes of my time for rebuttal. This Court has established a four-part test to determine the validity of a liability limitation included in a shipping contract. The question at issue in this appeal is whether the liability limitation in the party's shipping contract satisfies the second prong of that test, which asks whether the shipper had a fair opportunity to select the level of liability. Here, the shipper had more than a fair opportunity. It had complete control in selecting the level of liability. As the District Court found, the shipper unilaterally drafted a one-page contract and included an unambiguous industry term capping the carrier's liability at $2.40 per pound, and the carrier accepted that contract, countersigned it, and hauled the goods away. Under those circumstances, a shipper-drafted bill of lading with an unambiguous liability limitation appearing on the face of the document, every single court in the nation has enforced the liability limitation. The Second Circuit, the Third Circuit, the Fourth Circuit... We have to get to the question of whether it is a liability limitation before there's anything to enforce. Well, it is undisputed in this case at this point. It was found by the District Court that the phrase RVNX 240 is a liability limitation. It's a declared value. RVNX stands for released value not to exceed. But there was no declared value on that bill of lading, was there? The portion of the bill of lading that has the box that says to declare a value was left blank, but as the District Court found, what the shipper did was put in the box above that a clear designation RVNX 240, which in the District Court's own words represents the same thing. It represents a declared value. But it says when the rate is dependent on the value, and one of the things that a lot of those cases you're talking about talk about a fair opportunity to choose between two or more levels of liability, so understanding how it's tied to the value, and here they didn't do that. Well, respectfully, there are several courts out of the ones that I was listing that did not include that requirement at all. The 11th Circuit in the Siren case expressly rejected the notion that there had to be a correlation between value and rate. What happened in that case was the shipper had received a discount on the shipping rate, but the court, the 11th Circuit... And in all evidence here, they received a discount, correct? Well, what the evidence shows here is that the rate that was established, the $1.21 per mile, which was the flat rate established in this case, was based on a representation from the shipper that the value of the goods would be typically valued at $1 million or less. And then that was the shipping rate that was established for a large number of shippers. But as part of that shipping rate, one of the conditions of that shipping rate was that the terms and conditions for each specific shipment would be set forth in a freight receipt or bill of lading provided by the shipper, and this court found that the last time around. So that each individual shipment, the rate was established, and under that rate, the shipper was expected to issue a bill of lading, setting forth the terms and conditions. And so in that sense, the liability limitation, the RVNX term that the shipper included into the document here, was under the rate that was established by the partners. On the agreement between Exile and your client, subject to this, there was a master agreement, right? There was a master agreement between the carrier and the broker, but as this court found the last time we were here, that document could not possibly establish a liability limitation under the Carmack Amendment because the Carmack Amendment requires an agreement between the carrier and the shipper. Unless the bill of lading is ambiguous, then it could be considered correct. If the bill of lading were ambiguous, then respectfully, because the shipper drafted the bill of lading, what the Second Circuit said in the Mechanical Technologies case, is that actually if the shipper drafts the bill of lading and leaves the declared value blank, you go back to the carrier's tariff. And the carrier's tariff in this case actually has its own liability limitation of $100,000. So I don't think even an ambiguous situation in the bill of lading would not result in full value here. In fact, in the Eleventh Circuit case, in the Siren case, there was no RVNX designation. There were simply the words of Class 85, which also is— I have a secondary argument that I didn't see necessarily in your briefs, but I'm curious because you brought it up, which is this $1 million. Do you have a secondary argument, and I'm sorry if I missed it, that even if they win, it's limited to $1 million because they didn't ask for anything above that and they specifically agreed to? No, we have not raised that argument in our briefs. My point is simply that, first of all, the bill of lading is unambiguous, and I think that's established. Well, we still apply the Carmack Amendment. You agree to that. Absolutely. And then we look at the spare opportunity that we all agree. Yes, Your Honor. But my point is simply that in other circumstances where, for example, the bill of lading was completely blank because it was a shipper-declared value, the Court in the Second Circuit said when a sophisticated shipper using his own bill of lading leaves blank the space provided for declaring the release value of the goods, we will presume he did so deliberately with full knowledge of the consequences under the applicable tariff. So even if this bill of lading had been blank, I think we'd have a different argument, but we'd still have arguments for why. That's the Ryder Truck Lines case, right? That's the mechanical technology case, yes. Yes, versus Ryder Truck Lines. And in that case, the tariff included several rates, right? And there was a low rate. They had multiple rates from which to choose from, and the shipper didn't say otherwise, and the Court said they chose the lowest option. Yes, that's right, Your Honor. But there are other cases, too. So in the Eleventh Circuit siren case where, again, the Court said that the discount that the shipper received on the freight rate was irrelevant because what the Court said was when a shipper drafts a bill of lading incorporating language which is universally understood throughout the motor carrier industry to limit the liability of the carrier, said shipper will be bound by the terms of the contract irrespective of whether the shipper had actual knowledge of the limiting aspect of those terms. And what the Court said was that the discount it received on the freight rate went to the shipper's knowledge of whether it was limiting its liability. But then the Court went on to say that knowledge was irrelevant. So that was not a relevant factor in the Court's holding, and the Court makes that very clear when it says the statute requires nothing more than a valid written contract between the parties establishing a reasonable value for the purpose of limiting the liability of the carrier. Nothing more. Well, you know, under the Carmack Amendment, the presumption is that the carrier has to pay default to the actual loss, right? That's the general presumption. Actual loss, yes. The presumption is that the carrier— Right. And so it's a burden on your client to show an exception to the Carmack presumption. That's true, but again— And I guess what I want you to do is, how do you distinguish the 1953 Supreme Court case of, what, New York, New Hampshire, and Hartford Railroad versus Nafangel? Sure. And it says, only by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge than a carrier limit recovery to an amount less than the actual loss sustained. Yeah, and respectfully, that's where this whole notion of this requirement came from. It's been quoted over and over again by courts below, but you have to look at what that case actually was about. In that case, a railroad passenger handed her luggage to a SkyCat and walked away, and the SkyCat lost the luggage. There was no contract. The Carmack Amendment was not what was being interpreted in that case. And the Supreme Court actually said, no baggage check was given, no money was paid. There was no contract in that case, and it wasn't an interpretation under the Carmack Amendment of what type of contract alleviates the carrier from the full liability of the Carmack Amendment. In fact, it says what it says. Now, you didn't give your client a choice here. You're giving your shipper. No, but there are several decisions, including Judge Adams in the Northern District of Ohio, who explains why that requirement simply makes no sense in the context of a shipper-generated bill of lading. What requirement? The requirement that there be some menu where you have varying levels of shipping rates. Well, multiple courts have held that. But not in the context of a shipper-generated bill of lading. Even like in Siren, there was a 62% discount, right? And they referenced that in the decision. They referenced it, but then they went on to say that it was irrelevant to their holding. And the Third Circuit in the American Cyanide Decision versus Newton, Third Circuit, 1992, it wasn't. They didn't say it was irrelevant to the holding. They said, thus, assuming Siren did not actually know that it was limiting ESPY's liability, Siren certainly should have known. And it's in the same paragraph. They're talking about the discount. So they're saying the discount let them know that they weren't getting it. Where it's not clear to – is it – well, maybe I should ask the question rather than make a statement. Is it clear from this record that Excel-slash-Sandus knew they were getting some sort of discount? Discount from what, Your Honor? I mean, they knew that the shipping rate was established based on their own representation of value in the case. So they issued a request for truckload pricing where they said the value would be less than $1 million, and they got a shipping rate based on selling tax. I just said in general our shipments are less than $1 million. No, the specific request for this shipping rate said typically less than $1 million, and that was part of the understanding of the parties. But it's typically. It's not this shipment is valued at. It's too – I mean, it may not in your mind be a big difference, and it may not ultimately be a difference, but it's a precision question. That's correct, Your Honor. It's in saying typically, but certainly it established a level of understanding between the parties as to what types of shipments would be at issue. The contract – and subject to the contract, which said that after we give you this rate, $1.21 per mile, you, the shipper, will provide the bill of lading that has the specific terms and conditions for each shipment. And when the carrier, when the driver showed up to get the goods, he received a piece of paper, one piece of paper that had on it RVNX $2.40, and he signed it and took the goods away. There was no opportunity at all for the carrier to learn what was being transported other than that it was pharmaceuticals, no opportunity for the carrier to know the value of those goods. It was only on the basis of that one-page document that the carrier took the goods away. If that limitation hadn't been there, we don't know what would have happened. You say in your brief that they loaded it, they didn't say anything, you were not involved in that. Is that – that's not disputed, I presume? That's not disputed. In fact, it was one of the terms and conditions of the agreement. SLC was one of the terms, which is ship or load. The driver can have no involvement in that process. It relies entirely on what's printed on that one-page bill of lading. Another thing you mentioned is a request. They did make a request, but you agree they don't have to request the rates. That's a different prong. And when you're talking about fair opportunity, what I saw, you can correct me if I'm wrong, is most of the courts have said you have an obligation to present them different rates based on levels of liability. When there's a carrier-drafted bill of lading, or, you know, for example, there are some cases like the Estes case in the 11th Circuit where – not the Estes, there was a different case in the 11th – Sasse-Dahl. Sasse-Dahl is an interesting case, 11th Circuit. Shipper drafted a bill of lading – excuse me, carrier drafted a bill of lading, but the shipper filled in the blanks and wrote in a declared value. And the carrier tried to enforce the liability limitation in its own tariff. And the court said, no, you can't enforce the liability limitation in your own tariff because you didn't offer these multiple rates. What you must do is enforce the liability limitation that the shipper wrote onto the bill of lading. And that's what was enforced. And that's all we're asking for here. We're asking you to draft this stuff. Thank you, Your Honor. Thank you, Your Honor. Good morning, Your Honors. Mark Rubin on behalf of FLE and Prostatone XL. May it please the Court. I just wanted to get to a couple of quick points on whether or not the record was disputed or not on a couple of statements made by counsel. The issue about whether or not the value of the cargo was known, it's a good point that when it says typically $1 million or less, that implies that sometimes it will be more. They do that. Yeah, but your client's the only one that knew, right? Well, that's not exactly the case, Your Honor, because there was a prior loss. But the prior loss was like $80,000. That's correct. But I asked at that position whether they were able to extrapolate the value and noticed that this was actually a high cargo value and whether that caused them any concern based upon their assumptions, and they answered yes, we actually did do that. So they knew before this shipment that they were transporting high-value pharmaceuticals by extrapolation. You're right that that was a low-value loss because it was only a partial loss, but they knew. They also knew that the rate was not dependent upon value. There was never anything in the record that said that the 1.21 flat rate was based upon. But it seems you're coming to this court or to the lower court now, this court, and saying, look, we drafted this, we handed this over, we loaded the goods, but hold them accountable for the entire value of something they had no clue about. Well, I don't think it's fair to say that they had no clue, Your Honor, because it's also not fair to say that we're asking them to ignore contractual terms. Is there any evidence you made them aware of the value? Just what I said. So there's no evidence that you told them they were carrying an $8 million ship? No, Your Honor. They did sign a contract saying that they agreed to be liable for the full value. But that was with Excel. And that's a good point. I'm glad you brought that up. In order for them to have any basis to assert limitation of liability based upon the bill of lading, they have to go by with what Excel did, not with what Sanders did. Sanders didn't issue a bill of lading. Sanders didn't sign a bill of lading. Excel did it as an agent for Sanders. And who negotiated the rate on behalf of Sanders? Excel. So you have to take the totality of what was in Excel's mind. Not that the bill of lading is unambiguous. Well, and that's another good point, Your Honor. It definitely had to have been ambiguous. Otherwise, why did we have a remand? We had a remand. But what did the Sixth Circuit remand it for? They wanted to make a determination as to what tariff was in effect. And I thought that's because initially they were aligned to the MTSA. Well, no, Your Honor. The MTSA at the appeal was thrown out as a direct contract to PEC. The Sixth Circuit said the only cause that's going to be sent back is the Carmack amendment claim based upon the assignment from Sanders to Excel. The important point to note is that the court said three things needed to be determined. One, what did the parties intend by the terminology 240RBNX? If we're getting to intent, what did the parties intend? And we must assume that the Sixth Circuit thought it was ambiguous. Wait, do you dispute that the district court found it unambiguous? That this district court found it unambiguous? I think that the district court at the first level, the Sixth Circuit, and the district court at this level all know what the acronym means. That was never in dispute. The acronym means release value not to exceed. But it didn't have any application here for numerous reasons. Number one, it didn't comply with the strictures under the Hughes test, the Toledo ticket test, and the test that was actually established by the Sixth Circuit in this case, which is that even where you have a shipper-generated bill of lading and even where the shipper puts 240RBNX on there, that's not enough. You still need to comply with whether or not there was a meeting of minds on the limitation of liability. And here, nothing could be further from the truth. Not only did Excel say— So we love to pretend this court previously expressed a reluctance to protect a shipper from itself when it drafted the bill of lading. Here you have a sophisticated shipper who drafts a bill of lading, puts that value in. As they point out in their brief, you could have put any value in. You put that value in, and now you're coming— after you know a shipment was lost previously, and you're coming and you're saying, protect us from ourselves. I mean, that's the way it looks. That's understood. Obviously, if it wasn't on there, we wouldn't be before Your Honor. But if it was that simple, the Sixth Circuit never would have remanded it on that issue. It was on there before, and the panel actually asked me at the last hearing, well, what does RBMX mean? And we said, generically, it means release value not to exceed, but it doesn't apply in this context. So there really are no new facts. It's just a question of application of the law. And so we have to look and see what the remand was. They wanted to know what tariff was in effect for a reason, because they wanted to know if there was an opportunity to choose between two levels. We looked at the tariff that was in effect at the time. There wasn't. Subsequently, SRT changed their tariff. Now it complies. Now if you want to select a different limitation of liability, it tells you what to do to go ahead and do that so that you can find out what the increased rate is. But here—and I think it's important to know what the deposition testimony was on this 240 RBMX from the SRT side, because there was no consideration for it, and there was no meeting of the minds for it, and there was no reliance upon it. They want you to believe that they never would have accepted the shipment if there was no 240 RBMX on there. Nothing could be further from the truth. They admitted at deposition that if it had zero designation on there, they would have taken it. If it was to have a limitation of liability of a million dollars, they would have taken it. The trucker was not authorized nor did he have any knowledge of what to do or not to do if that term was on there. So it was an unbargained for term. They got no consideration for it, and the way that this operated out of the warehouse, Excel and Sandoz weren't even trying to make this be a bill of lading. It was a document that is a warehouse control document, and that's what the Sixth Circuit focused on last time, and none of the testimony changed in that regard on remand. So when you asked if there was a fact dispute on that, the district court correctly followed the remand instructions and looked at the tariff. There was no opportunity to choose between two rates, and followed the Sixth Circuit's holding, which I believe is now law in Ohio, by saying that even where a shipper issues its own bill of lading and even where they put the 240 RDNX designation on there, it still has to comply with the remaining. In fact, Judge Graham below is not the only neutral party to have read the Sixth Circuit that way. Magistrate Judge Likovitz in the Synergy Flavors versus Average Express case in the southern district of Ohio also read it that way. In reading the Sixth Circuit ruling, and I quote, the Sixth Circuit in Excel gave no indication that the fact that the shipper drafted the bills of lading altered the analysis for ascertaining the validity of the limitation of liability. And the 240 RDNX was perfectly explained to the Sixth Circuit last time, and they found it to be ambiguous anyway. They remanded it. If we find it unambiguous, do you lose? No, Your Honor, because it still requires compliance with the Toledo ticket test. And it goes to the very heart of how and why limitation of liability applies. As Your Honor noted in the Notting Hill decision, the U.S. Supreme Court, regardless of the facts, practically every decision that goes into it notes that consideration is an element of a limitation of liability. It's a risk allocation. It's do I want to roll the dice? Do I want to get a cheaper shipping rate, and I will hold the risk for what might or might not happen to the shipment, or do I want to have peace of mind and pay a little bit more for the free charge? The bill of lading is also unambiguous in the sense that it says only where the rate is dependent on value do I need to declare a value. So essentially the 240 RDNX is a nullity. It's something that got cranked out from the classification of the type of cargo that was being moved because it was a flat rate. XL is the agent for Sandoz, is the one who negotiated the flat rate. And so when you have to look at the intent of the parties, and one of the elements of the Carmack Amendment that was sent back on the remand is, was there an agreement to limit liability? And no, there wasn't. You have SRT testifying that they didn't rely on it. They didn't even think that they had a limitation of liability. They were sending emails the week before the shipment saying, please, we need to renegotiate. We need to get a limitation of liability in effect. So they didn't think that they had a limitation of liability, and we didn't think we had a limitation of liability, and there was no decrease in the freight rate and no consideration and no reliance. How could there have been an agreement to limit liability? That gets us to the final problem, which is in the actual statute itself, which is the limitation of liability has to be reasonable under the circumstances surrounding the shipment. Well, what were the circumstances surrounding the shipment? We had a master transportation service agreement that was entered into between SRT that it knew was governing these shipments with the shipper's agent for full replacement costs. Both parties to that contract thought that that's what the limitation was. This court said no. The district court followed this court and is not going to apply that full replacement cost under the MTSA. But it's still relevant to determine what the circumstances surrounding the shipment were. What else were the circumstances surrounding the shipment? We had the capital, which was the constant security protocol that was entered into after the first loss. Excel testified that they were going to pull the business, the Sandoz business, from SRT if they didn't agree to these additional security measures. SRT testified that they don't provide this typically to every shipment, and they weren't providing it to the Excel Sandoz movements prior to the first loss because there was a cost associated with doing so. They agreed to go ahead and provide it and not pass the charge along. So we have this additional undertaking, additional promise. We will not leave the cargo unattended. And if something comes up, we're going to use this macro 34, which is to put dispatch on notice if something out of the ordinary is going to occur so that they can take an action. In this particular case, if the driver needed to leave the vehicle for some reason, he was supposed to send an electronic message so that something could happen. He didn't do that. He left the vehicle unattended, and he left the keys in the cab, and not surprisingly, $8 million worth of pharmaceuticals were missing when he came back to the truck. That's the circumstance surrounding the shipment. They made a promise to keep the business that they would not leave the cargo unattended, and they did. So is there any consideration for that promise? Yes, Your Honor, two pieces of consideration. One, us not pulling the business. And two, they testified at deposition that there was an added cost to them that they ate to keep the business. Later on, they tried that. So explain that to me. If you're going to enforce that, would that be a breach of contract, or would it be some sort of negligence action? Neither, actually, because you couldn't have a separate cause of action as it would be preempted, just like by the Car Makers Act. So then why does that matter? It's an affirmative defense to an affirmative defense, which the district court will correctly recognize. So just like any limitation of liability, they're not suing on a breach of contract for the bill of lading to enforce the limitation. It's an affirmative defense. And we're saying your affirmative defense is invalid because. So that's typically how it works. What about all the cases they cite in their brief? I'm looking at page 24, where they say, anytime the shipper drafts a bill of lading, essentially the shipper has a fair opportunity. And I know I'm going back to the fair opportunity problem. A fair opportunity, thus, shipper loses. Well, again, you correctly pointed out in your questioning of opposing counsel, in those cases, they knew or received a discount on the freight in exchange for the placement of the limitation of liability. This court has said the analysis does not change just because it's a shipper bill of lading. And we received no discount. And there was no meeting of the minds. And there was no consideration. The final point is on the damage section, Your Honor. We put on damage of both actual loss, which was $8.6 million, as well as what the replacement cost was, which was $5.9 million. Therefore, there was no contrary evidence as to what the actual two damage levels were. The issue was who has the burden to establish a departure from the standard CARMAC rule, which is actual damages as opposed to replacement costs. We think that the district court sort of split the baby on the burden and created new law. We think the burden is squarely on the carrier. The court agreed that the initial burden is on the carrier to establish a departure. But we think that merely establishing that this cargo was replaced and so we were able to replace this shipment and get a replacement shipment to the customer doesn't end the inquiry. We think that they have a burden to disprove both the continued inventory argument as well as the competition in the industry argument. You know what, though? One of the directors of finance at San Jose, Martin Garibu, or what Martin? Garibu. Testified in his deposition, didn't he, that the customer service report card did not attribute any lost sales to the sold-in shipment? I'm not sure exactly which page you're on, but I do know that he clearly testified. It's page 6033. Sure. I do know that he clearly testified, and this is what we were relying upon, Your Honor, that we could sell everything we could make. That is, we were moving it, moving it, moving it, moving it. So, yes, I think what he was referring to there was that this particular shipment, we didn't get dinged for on the quarterly report because we were able to replace it, but it's a lost-volume sales theory. It continues on and continues on and continues on. So if you can sell as much as you can make, the courts have recognized that you're entitled to that property. Thank you. All right. Would you say something to that group? I tried to, Your Honor. I'll just take a minute if you don't mind. The United States Supreme Court in 2004, unanimous opinion written by Justice O'Connor, said that when determining the extent of a liability under a bill of leaving, it is, quote, a simple question of contract interpretation. And it went on to say, quote, there is no reason to contravene the cause's obvious meaning. This is a one-page contract. We've been litigating this case for nine and a half years. This is a one-page contract between the shipper and the carrier that says, on its face, release value not to exceed $2.40. The last time we were before this court, there was confusion among the parties, including my opposing counsel here, as to what RVNX meant. And the circuit court said that it was not clear what RVNX meant. They said it's not conclusive what RVNX means. That's why we went back to the district court. We got back to the district court, and the district court found that it was unambiguous. That should be the end of this matter. Why don't we still have to apply the Farm Act amendment and determine if there was a fair opportunity to choose between the rates? Yes, but where the shipper – again, it goes back to my theme. Where the shipper drafted a bill of lading, the shipper obviously had every opportunity to select. So we have to buy that for you to win, right? No, I don't think so. I think Your Honor can look at the fact that the rate here was the function of a value representation by the carrier. The fact that there is actually unremitted deposition testimony here that the carrier would not have taken these goods if it knew that the value was $8 million. It's not the business they're in. This is a small regional trucking company out of Tennessee. They're not in the business of carrying – Isn't it owned by a bigger company? I'm sorry? Isn't your client a subsidiary of a bigger company? Well, it's a wholly owned subsidiary, but it's still its own company, its own corporate entity down in Tennessee. Yeah, it's a small regional trucking company down in Tennessee. It's owned by a company in transportation. Well, what's your best case where a bill of lading was held in trouble and where there was no choice? American Sandman v. Newton, Third Circuit. No choice whatsoever. All the arguments that my opposing counsel was raising were raised in that case. They argued material deviation. They argued lack of reasonableness. All rejected by the Third Circuit. The Third Circuit said when the shipper drafts the bill of lading, it is per se reasonable to enforce, but the shipper – Was there a discount in that case? There was no discount in that case. But I didn't – they didn't discuss – right. They didn't talk about in that case the fair opportunity to choose between arguments. Well, they went to the Carmack Amendment test, and they said that under the Carmack Amendment, the limitation applies. Again, F.M. Machine, Northern District of Ohio, explained exactly why this requirement makes no sense in the context of a shipper-generated bill of lading. It said the rationale supporting Toledo ticket – that's the menu requirement – is missing when examining a case in which the shipper has drafted the bill of lading to hold otherwise would require the carrier to explain to the shipper the meaning of the very terms that the shipper had included in the bill of lading. But I thought in that case it appeared at least that the shipper had knowledge of the different rates that they owed. It's possible in that case that they did. But again, that's not what the court focused on in the holding. The court in that case, in Siring, in American Sounding, in – In those cases, was there a master agreement like there was here that was about doing the parties clearly controls over the bill of lading? There have been in several of these cases, yes. There was an Essex – there's a recent case out of the 11th Circuit called the Essex case that just came out a couple of weeks ago. There was a broker agreement there. And in that case as well, the courts enforced the shipper-generated bill of lading terms in that bill of lading. So these facts are not unusual. The arguments that we're hearing from the other side get raised all the time in these cases. There's always an attempt by the shipper to try to evade the Carmack Amendment because they're trying to get out of what it says right on their bill of lading. And the Carmack Amendment was designed to impose predictability and certainty, give carriers certainty as to what their limits will be. And when a carrier picks up a set of goods and gets a document and it says right there what the liability limitation would be, to spend nine and a half years litigating whether that liability limitation should hold really makes no sense. It's the exact opposite of the Carmack Amendment. If there are no other questions, your time is up. Thank you. Thank you for the hard work. We appreciate the argument that has been given and we'll consider the case.